vera, 18-1393. Thank you. Good morning. May it please the Court, Robert Culp assigned counsel for Hector Rivera, who's serving a life sentence for three counts and a murder for a high-profile crime. Robert, the murder took place in 2004 in response to a beating that took place in 2001, yet this case was not brought until 2015 and tried until late 2017. Any examination of this case must take into account both the passage of time and the serious credibility baggage brought to the case by the government's witnesses, who were all seeking major time off, enormous potential sentences. That included Ronnie Amrussi, who was the man who was severely beaten by the victim, Eddie Nektarov, yet claimed he knew nothing about the murder, even though he said he paid money off of it. Alexander Morales, who contradicted Amrussi on whether he knew in advance about a murder, wrote a tell-all book. Excuse me, you're arguing a sufficiency point. Is that correct? I'm introducing my argument, Judge Walker. I apologize for, if I feel you're wasting your time. Your sufficiency. That's just an introduction to all of my points, that there's serious credibility issues. I actually want to focus on point three. But you make a sufficiency argument, but only as to the interstate travel element of the crimes of conviction. Yes, yes. Is that correct? That's right. That's right. You have 10 minutes, so. Yeah. I'm trying to get to it, Judge. Just on the sufficiency point and the travel point, why isn't the travel to Puerto Rico sufficient in and of itself? Our argument, Judge Cuddle, is that you don't have the quid pro quo at the time of the travel. The quid pro quo is essential to these charges, as the Court has pointed out. Wasn't there, at least at the time of the trip to Puerto Rico, an intent to commit the murder for hire? That's why the – that was the purpose of the trip. Our argument is that there's got to be more than an intent under this statute, that there's got to be a quid pro quo at the time. Sure. But an intent to commit murder for hire, right? And looks like that's what the purpose of the trip was. Right. But there was no arrangement, no quid pro quo. They hadn't even found the alleged murderer, Fortier. He wasn't even in Puerto Rico, in fact. So there's got to be a completion of the entire scheme in order to satisfy that provision. That's our position, that there has to be the quid pro quo at the time of the travel, yes. I actually wanted to – Is that based on something in the text of the statute? Not the text. This Court's cases that we cite in the brief about the quid pro quo, and I have nothing more to add to that. And in terms of interstate travel, okay. I apologize. I actually wanted to focus on point three, if I might. As I had been saying earlier, it was important in a case like this with the credibility issues that the defendant be given a chance to defend on the case. And he was not permitted to cross-examine the state detective on the threats that were in the police records that had been directed towards the victim. Now, it's understood that this cannot be offered, this kind of line of examination cannot be offered for the truth of the matter asserted. But what was it being offered for? On the quality of the investigation, Your Honor. That's a classic basis of cross-examination. This Court in the Coles v. Ercole case, the habeas case, it's of course – The judge allowed examination with respect to the quality of the investigation. He allowed examination with respect to the other assault. He allowed examination with respect to the fact that someone else was being prosecuted for that. The only thing he didn't allow was the plain hearsay threat, which was at least double hearsay. That's a big exception, Your Honor. I mean, he did allow him to go into the prior shooting, but the threat itself to the victim, which from Mr. Rivera's – I understand it's not in for the truth, but from Mr. Rivera's point of view is the thing that they have to investigate, a possible threat to the victim, depending on your reading of the documents, either hours or a day before the murder. And I think it's important to remember that this is something that he was entitled to ask this detective about, you know, did you take the proper steps to investigate this. I'd like to point out that the detective wasn't the author of the – even the author of the memo, right? I mean, somebody else authored the memo. Right. He did not offer the memo, but he was the – And the source wasn't clear either, was it? There was some confusion on that, Your Honor, absolutely. And weren't there – wasn't there at least one witness available to testify as to the threat directly? Not a witness that was reasonably available to the defendant. I mean, the suggestion I saw in here was that the defendant was supposed to call the victim's brother to the stand on this. To me, that's crazy. That's not a serious option, to call the victim's brother. There's no exception for the unavailability of the direct witness to the hearsay rule, is there? No. There's no such exception. But the – Dela Roca, the detective who testified, is the witness that the government called. And this was the witness that the defendant was entitled to cross-examine on this point. And the fact that he had come into the case later I don't think makes a difference. And it didn't make a difference in Alvarez v. Ercole that he had come in a little bit later. He was familiar with the investigation. He previously had testified about the investigation even before he came on. I'm sorry, Judge Kotler. No, that's okay. I get interrupted all the time. Wasn't any argument waived? I mean, the judge went to great pains to say, here are all the other things you can do. Come back to me. Maybe I won't even, you know, press the hearsay issue, but you've got to do more. And then the attorney said, we've thought about it, Your Honor. We've decided not to pursue that inquiry because we've decided to go another way. Not waived. Not waived at all, because the choice that the judge was giving to the defendant was, I'm not going to let you cross-examine the government's witness on this. Absolutely not. But you can put on an affirmative case if you want. That's what he didn't want to do. He didn't want to have to call the victim's brother. But he said he decided to forgo that portion of the defense case for strategic reasons when the district court asked why he wasn't pursuing this line of defense. Strategic reasons, right, because his choice, he didn't, he wasn't given a fair choice. He was given the option of putting on an affirmative case, which any defense lawyer will tell you, and he did in this case, that he didn't want that affirmative case to be measured up against his attacks on the government's credibility. But didn't he have other ways also of establishing what investigation was pursued? I mean, that struck me as a distinction between what happened in Alvarez and here, in that it appears that the government did, the prosecution did pursue, or the law enforcement did pursue other avenues of following up on these threats, and that was not the case in Alvarez. That's an interpretation of some of the documents that the government made at the time, and I'm sure will make in a moment. But it's the defense's prerogative to ask those questions to the witness and the defense lawyer, not to make these judgments sort of at a sidebar, if you will. So our point is that he had the right then to confront that witness against him, not put on an affirmative case later on, but to confront this witness, who the government put on to testify about the scope of the investigation. So why can't the defendant confront him on this? I'd like to point out that there's a lengthy record here, and I would guess you find it a good record, in that Judge Engelmeyer asked the lawyer's questions at length and read from the document and so forth, but he did change his mind. If you note at page A54 to 55 of the appendix, I'm going to permit this in the interest of bending over backwards and making sure that there is a full opportunity for the defense to explore this avenue. But I want to make clear, the threats are coming in, are not coming in as a matter of the truth asserted. Well, they were never offered for the truth of the matter asserted. I realize that is singular here. But then 20 pages later, oh, my God, we can't have these threats come in because the jury won't be able to abide by my instruction not to take it. He gave it more measured consideration when there was a little more time and there was a discussion then for 20, 30 minutes. He gave it more measured consideration, exactly. But I'd like to suggest he was right the first time. All right. Thank you very much. I think we have the argument, and you have 2 minutes of rebuttal, Mr. Cope. Thank you. We'll hear from the government. May it please the Court. My name is Scott Hartman. I represent the government on this appeal, and I also represent the government in the district court below. With the court's permission, I'd like to start where you left off with Mr. Cope, talking about the preclusion of cross-examination on this point. And there are just a couple of points that I'd like to make about that. The first is that with respect to the proffered reason for this cross-examination, which was to impeach the government's case, one of the points that Judge Cope made was that the equitative value of this cross-examination was very low. And that's for several reasons. The first is that the actual lead that was being identified as part of the defense counsel's review of these police reports was very thinly sourced. It wasn't at all clear what the source of the lead was. And as a result, it wasn't at all clear how the police learned this information or whether it was the result of some sort of misunderstanding about— that suggested that maybe someone else had a motive and maybe an opportunity even to commit the murder that Mr. Cope's client was eventually convicted of. And, I mean, clearly the district court was troubled by it. I mean, why wasn't it error to be a little more expansive in allowing the defense to pursue whatever it wanted to do with that report? Well, what Judge Engelmeyer said is that he encouraged defense counsel, and he said this repeatedly, to develop this evidence either as an effort to impeach the government's case or to impeach the police investigation or as affirmative evidence, substantive evidence, of an alternative perpetrator or an alternative motive. And he, in fact, directed the government to make available the person who it appeared authored this memo, who was a police lieutenant. He directed the government to make available these witnesses. Based on our review of the police reports, we identified the person who we believe made the phone call to Mr. Nekteloff, and there's some discussion of this in the transcript. There's also some discussion of reporting that was provided by the victim's brother, and Judge Engelmeyer directed us to make that—the victim's brother available as a potential witness. And we did that, and it's reflected in—I think it's page 90 of the transcript that we offered to do that. And ultimately, defense counsel, for strategic reasons, made a decision not to pursue this. Now, I take Mr. Kolb's point that it wasn't incumbent on defense counsel to present an affirmative case, but if what defense counsel wanted to do was impeach the investigation, it was incumbent on defense counsel to impeach the investigation through competent evidence. And the issue here really was that Detective De La Roca, as I think Judge Engelmeyer said, was an incredibly flawed vehicle for doing that. And the reason for that was because Detective De La Roca, I think it was undisputed, had no personal knowledge of any of these issues. He had no personal knowledge of the fact of the threat. He had no personal knowledge of what follow-up occurred. All this happened a year before Detective De La Roca became involved. And so just so the Court's clear, the history of this is that the murder happened in 2004. There was an extensive investigation in 2004, including an effort to look at this threat. And as I was saying earlier, part of what I think factored into Judge Engelmeyer's analysis was that this evidence wasn't particularly probative of weaknesses in the police investigation because the police did in fact do a fair amount of investigation. And were those, was there testimony to that effect in the record about the scope of the investigation? That was Detective De La Roca? What Detective De La Roca testified about, and I think this may be a misunderstanding in terms of the way the testimony, the direct testimony is being portrayed, there were two things he did. One is he narrated video clips that were, showed the murder and the perpetrator of the murder running from the scene. Those were offered pursuant to a stipulation. And so Detective De La Roca wasn't testifying as a precipient witness with respect to those clips. He was really testifying as a summary witness or a narrative witness that was describing what you see and orienting the jury to where they were facing and whatnot. He did put in a couple of facts that he knew through hearsay and they were without objection. He put in the date of the murder, the location of the murder, and the name of the victim and the location where the victim worked. But other than that, the evidence that he put in was all precipient information that he had based on his review of the video clips which were offered without objection pursuant to a stipulation. And then his own work a year later in 2005 once the shooter was identified. And so Detective De La Roca did talk about his investigative steps in 2005 well after the efforts to develop evidence with respect to this alternative perpetrator had concluded and his efforts with respect to photo arrays and photo identification procedures once the actual shooter had been identified. And I think this is clear from the briefs but the way the shooter was identified is that he used the same gun that was used in the murder in a separate shooting. He was arrested in connection with that shooting and then eyewitnesses to the murder identified the shooter. And that was really where Detective De La Roca was involved. And so it's not the case, Judge Engelmar at one point says what defense counsel is trying to do here is use Detective De La Roca as a sort of 30B6 witness to talk about the investigation. And it's not the case that that's what the government did on the direct. And so I think it's a little bit unfair to say that the government did do that and so therefore a cross-examination should have been allowed on this point. Judge Engelmar was concerned that any information that Detective De La Roca would have about investigative steps that were taken with respect to these leads would be the result of hearsay purely by reading the reports that were available I think undisputedly to everyone in the courtroom. And so what he was really asking defense counsel to do is find a witness who is competent to speak to the police investigation on this point. And the government offered to make that witness available and defense counsel declined. So if the scope and quality of the investigation was the defense's actual focus, what options were available to it to criticize the scope of the investigation? Well, certainly defense counsel could have called another police officer and as I said, the government made officers available who could speak to that issue, who could speak to the nature of the threat and the basis for the threat. Again, there's a report that's a police report, but we were never able to defense counsel wasn't able to identify a witness statement that supported that threat. There were witness statements about the Penisoff shooting and the fact- Was it even clear which officer prepared the report? It wasn't clear, Judge Carney. Judge Engelmar at one point says the report appeared to be authored by this police lieutenant, but if you look at the document and we're happy to provide it to the court if you'd like, the document itself is very unclear about its information and at one point, this is sort of an omniscient document. This is written as a report, a description of the nature of the leads that the police are pursuing to someone higher up in the police administration. It's really a bureaucratic document. And so what we were looking for and I think what Judge Engelmar was looking for was a witness who was competent to talk about the basis for what was in the report. And the best we could do is this lieutenant who appeared to have his name on the report or And in our view, and I think in Judge Engelmar's view, that was the appropriate vehicle was to find a witness who actually knew about these and could speak meaningfully to the follow-up. Just another point on this, I talked about this earlier, but in terms of assessing the probative value of this information and whether Judge Engelmar properly excluded it pursuant to Rule 403, I think one of the factors that he really emphasized is that there really was a lot of meaningful follow-up with respect to the Penisoff shooting. The victim's brother was interviewed. Mr. Penisoff was interviewed. And this is in the record or this was made clear at the sidebar? I'm sorry, Judge Carney, let me interrupt you. There's colloquy about this at the sidebar. And then there were reports that are being referenced at the sidebar that were part of the 3500 material. And I think it was undisputed that there were these interviews. But that was also available to the defense. Absolutely. And again, we agreed to make these witnesses available, one of whom was the victim's brother and was in the courtroom. There's a whole colloquy about the fact that he's in the courtroom. Judge Engelmar asked that he be excluded so that he wouldn't be tainted as a potential defense witness. Can I ask you a question on another issue in the case? Of course, Judge. Which is you rely on the travel to Puerto Rico and you rely on telephone calls. The telephone calls go from the Rivera cell phone to the shelter where Fortier is staying. There's no testimony about the substance of those calls. Are there any sort of comparable cases where the conclusion that those calls were part of the murder for hire, that that is circumstantial evidence rather than simply speculation for the jury? Judge, with respect to the question about comparable cases, I'd have to look at that and we can look at that if that's something you're interested in. I can tell you with respect to this evidence, our view is that it's not purely speculative. The relationship between Mr. Rivera and Mr. Fortier was purely in the context of this murder for hire plot. They didn't have a prior relationship. They didn't know each other. Mr. Morales introduced Mr. Fortier and Mr. Rivera for the purpose of carrying out this murder for hire plot. And there was testimony from Mr. Morales that at that first meeting where they were introduced, Mr. Rivera and Mr. Fortier exchanged phone numbers. And so there was a basis in the record for the jury to conclude that Mr. Fortier had Mr. Rivera's phone number and that Mr. Rivera had Mr. Fortier's phone number. And what we see in terms of the pattern of the calls is there's a number of calls, and the government's appendix has the chart that was presented to the jury. I think it's the first item in the government's special appendix or addendum. But what you see is there are a number of calls between the introduction and the murder, including on the day of the murder. And then there are very few calls, if any, after the murder takes place. And so our view is the fact of the numbers being exchanged, the fact of the relationship and that the relationship was circumscribed by the murder for hire plot, and the fact the pattern of the calls, the fact that they occur and then the last one occurs on the day of the murder, just before the murder takes place, that is powerful circumstantial evidence of these calls being for the purpose of accomplishing the murder for hire plot. On the other point, the travel point, I do think it's sort of unassailable that the travel was for the purpose of carrying out the murder for hire plot. I understand defense counsel's argument with respect to the travel to be that there was no agreement with Mr. Fortier, the shooter, at the time of the travel, and that's absolutely true. But what there is in evidence is there's an agreement between Mr. Morales and Mr. Rivera at the time of the travel. And what Mr. Morales testified is that at that very first conversation where Mr. Rivera discussed with Mr. Morales the plot, they discussed the fact that the murder would be carried out for compensation and for consideration, both for Mr. Morales and for the individual who he ultimately recruited to carry out the murder. And so in our view, there was a quid pro quo, there was an agreement. It was between Mr. Rivera and Mr. Morales, and that occurred at the very first meeting well before the travel took place. Thank you very much. Thank you. Mr. Culp, you've reserved two minutes for rebuttal. Just real quickly, yeah, as we got into it earlier on that last point, that our point, our position is that the quid pro quo has to be established in advance, that Fortier is sort of an essential person to all this, and that there is no agreement to hire him to commit a murder unless he's in on it. I understand the government disagrees. On the phone, Judge Codal, I did cite a case in my brief. It's a Northern District of Georgia case, U.S. v. Sullivan. Just wanted to call that to your attention. It's a case where there were phone calls and the court held on a motion that there was no connection to the murder. I'm arguing the facts here that it's speculative for the reasons stated in my brief, but I did want to call that to your attention. And although I think I responded to this earlier, just going back to the issue three that I chose to emphasize, this, the government keeps calling him a percipient witness to certain things, but he did testify whether he was helping them go through stipulations or not. He did testify about a scope of the investigation that was before he started working. This is at Dela Roca I'm talking about. And I also, he's an investigator. This is an investigation that started in 2004 and from my client's perspective, continued into 2015. He wasn't the lead investigator, was he, during that whole time? Didn't he arrive after the fact? He came in a year afterwards, but my point is that you inherit investigation. I think you're allowed to ask an investigator, well, why didn't you look into these statements about threats made to the victim? Just because he came in a year later, doesn't mean that you can't look into them. And if he has an answer, let him give the answer. And from the jury. But my understanding was also that there's, there wouldn't have been a good basis for that question since materials produced to you in 3500 context and statements at sidebar and so on suggested that they had looked into some of these things. They had looked into it, but he's the investigator. Why can't the defendant ask him, why didn't you look into this further? Or what did you do? What is your awareness? He inherited the investigation. It's not something that you can say, oh, he had nothing to do with because he wasn't on the job for the first year. The year that the connection was made with the gun. The gun was used in another crime. Yes, yes. And that was then tied to this. I believe that the shooter, Fortier, was involved in another shooting in the Bronx and was arrested, and I think that connected up the ballistics. Do we know the date of that? I yield to the government if you want the specific date. I don't have that kind of information. What year? Oh, I believe that was within a year or so. It was about a year later. A year later than what? Yes, yes, I believe so. All right. Thank you very much. Well argued. We'll take the matter under advisement.